# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

September 21, 2022

**FILED BY** ___*JE*___ **D.C.**

**Sep 21, 2022**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

Clerk - Southern District of Florida
U.S. District Court
400 N MIAMI AVE
MIAMI, FL 33128-1810

Appeal Number:  20-11736-GG   ; 20-12467 -GG   ; 20-12545 -GG
Case Style: Keith Stansell, et al v. Samark Jose Lopez Bello
District Court Docket No: 1:19-cv-20896-RNS

A copy of this letter, and the judgment form if noted above, but not a copy of the court's decision, is also being forwarded to counsel and pro se parties. A copy of the court's decision was previously forwarded to counsel and pro se parties on the date it was issued.

The enclosed copy of the judgment is hereby issued as mandate of the court. The court's opinion was previously provided on the date of issuance.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to:  Lois Tunstall
Phone #:  (404) 335-6191

Enclosure(s)

MDT-1 Letter Issuing Mandate

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-11736

_____

KEITH STANSELL,

MARC GONSALVES,

THOMAS HOWES,

JUDITH JANIS,

as Personal Representative of the Estate of Greer Janis,

MICHAEL JANIS, et al.,

                              Plaintiffs-Counter Defendants-Appellees,

SATORI FINE LINENS,

NEWMIL MARINE, LLC,

                              Intervenors-Plaintiffs,

*versus*

REVOLUTIONARY ARMED FORCES OF COLOMBIA,

2                                                          20-11736

                                                          Defendant,


UBS FINANCIAL SERVICES, INC.,
BRANCH BANKING & TRUST COMPANY,
SAFRA NATIONAL BANK OF NEW YORK,
MORGAN STANLEY SMITH BARNEY, LLC,
SAFRA SECURITIES, LLC,


                                        Interested Parties-Appellees,


CITIBANK, N.A.,


                Interested Party-Cross Claimant-Counter Claimant,


                    _____


            Appeals from the United States District Court
                for the Southern District of Florida
                D.C. Docket No. 1:19-cv-20896-RNS
                    _____


                    _____

                        No. 20-12467
                    _____

KEITH STANSELL,
MARC GONZALVES,
THOMAS HOWES,
JUDITH JANIS,
as Personal Representative of the Estate of Greer Janis,
MICHAEL JANIS, et al.,

                    Plaintiffs-Counter Defendants-Appellees,


*versus*

LEUCADENDRA 325 LLC,

                              Claimant-Appellant,


SAMARK JOSE LOPEZ BELLO,

                    Intervenor-Cross Defendant-Appellant.


_____

Appeals from the United States District Court
for the Southern District of Florida

4                                                          20-11736

D.C. Docket No. 1:19-cv-20896-RNS

_____

_____

No. 20-12545

_____

KEITH STANSELL,
MARC GONSALVES,
THOMAS HOWES,
JUDITH JANIS, as Personal Representative of the Estate of Greer
Janis,
MICHAEL JANIS, et al.,

Plaintiffs-Counter Defendants-Appellees,

SATORI FINE LINENS,
NEWMIL MARINE, LLC,

Intervenors-Plaintiffs,

*versus*

REVOLUTIONARY ARMED FORCES OF COLOMBIA,
COLES ADVENTURES, LLC,

Defendants,

20-11736               Opinion of the Court                    5

UBS FINANCIAL SERVICES, INC.,
BRANCH BANKING & TRUST COMPANY,
SAFRA NATIONAL BANK OF NEW YORK,
MORGAN STANLEY SMITH BARNEY, LLC,
SAFRA SECURITIES, LLC,
OXBOW CARBON, LLC,
SSMPETCOKE, LLC,
OXBOW ENERGY SOLUTIONS, LLC,
 Interested Parties,
LOISINETTE LEIVA,
Trustee of LLP Trust

                                        Interested Party-Appellant,


CITIBANK, N.A.,

                        Interested Party-Cross Claimant-Counter Claimant,


_____

Appeals from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:19-cv-20896-RNS

_____

JUDGMENT

6                                                          20-11736

It is hereby ordered, adjudged, and decreed that the opinion issued
on this date in this appeal is entered as the judgment of this Court.

Entered: August 23, 2022

For the Court: DAVID J. SMITH, Clerk of Court

[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————————

No. 20-11736

————————————————

KEITH STANSELL,
MARC GONSALVES,
THOMAS HOWES,
JUDITH JANIS,
as Personal Representative of the Estate of Greer Janis,
MICHAEL JANIS, et al.,

Plaintiffs-Counter Defendants-Appellees,

SATORI FINE LINENS,
NEWMIL MARINE, LLC,

Intervenors-Plaintiffs,

*versus*

REVOLUTIONARY ARMED FORCES OF COLOMBIA,

2                    Opinion of the Court                    20-11736

                                                    Defendant,

UBS FINANCIAL SERVICES, INC.,
BRANCH BANKING & TRUST COMPANY,
SAFRA NATIONAL BANK OF NEW YORK,
MORGAN STANLEY SMITH BARNEY, LLC,
SAFRA SECURITIES, LLC,

                                    Interested Parties-Appellees,

CITIBANK, N.A.,

                    Interested Party-Cross Claimant-Counter Claimant,

SAMARK JOSE LOPEZ BELLO, et al.,

                    Intervenors-Cross Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:19-cv-20896-RNS

_____

———————————

No. 20-12467

———————————

KEITH STANSELL,

MARC GONZALVES,

THOMAS HOWES,

JUDITH JANIS,

as Personal Representative of the Estate of Greer Janis,

MICHAEL JANIS, et al.,

Plaintiffs-Counter Defendants-Appellees,

*versus*

LEUCADENDRA 325 LLC,

Claimant-Appellant,

SAMARK JOSE LOPEZ BELLO,

Intervenor-Cross Defendant-Appellant.

4                    Opinion of the Court                    20-11736

———————————————

Appeals from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:19-cv-20896-RNS

———————————————
———————————————

No. 20-12545

———————————————

KEITH STANSELL,
MARC GONSALVES,
THOMAS HOWES,
JUDITH JANIS,
as Personal Representative of the Estate of Greer Janis,
MICHAEL JANIS, et al.,

Plaintiffs-Counter Defendants-Appellees,

SATORI FINE LINENS,
NEWMIL MARINE, LLC,

Intervenors-Plaintiffs,

*versus*

REVOLUTIONARY ARMED FORCES OF COLOMBIA,
COLES ADVENTURES, LLC,

20-11736              Opinion of the Court                    5

                                                         Defendants,


UBS FINANCIAL SERVICES, INC.,
BRANCH BANKING & TRUST COMPANY,
SAFRA NATIONAL BANK OF NEW YORK,
MORGAN STANLEY SMITH BARNEY, LLC,
SAFRA SECURITIES, LLC,
OXBOW CARBON, LLC,
SSMPETCOKE, LLC,
OXBOW ENERGY SOLUTIONS, LLC,


                                                   Interested Parties,

LOISINETTE LEIVA,
Trustee of LLP Trust,

                                              Interested Party-Appellant,


CITIBANK, N.A.,

                    Interested Party-Cross Claimant-Counter Claimant.


                    _____


            Appeals from the United States District Court
                for the Southern District of Florida
                D.C. Docket No. 1:19-cv-20896-RNS

                    _____

Before WILLIAM PRYOR, Chief Judge, JORDAN, Circuit Judge, and BROWN, District Judge.*

JORDAN, Circuit Judge:

For plaintiffs in civil litigation, obtaining a favorable judgment is only one step on the road to financial compensation. That is because a judgment is essentially worthless unless the holder can collect on it. *See, e.g.,* David Barnhizer, *Abandoning an "Unethical" System of Legal Ethics*, 2012 Mich. St. L. Rev. 347, 401 ("If you cannot collect the money, the paper value [of a judgment] is little more than symbolic."). So when the defendant liable for a sizable judgment is a foreign terrorist organization, collection efforts are not surprisingly often directed at third parties.

These consolidated appeals constitute the latest chapter of a long-running legal battle over attempts to satisfy a 2010 default judgment of $318 million under the Anti-Terrorism Act, 18 U.S.C. § 2333, against the Revolutionary Armed Forces of Colombia (the Fuerzas Armadas Revolucionarias de Colombia or FARC) for murder and kidnapping. *See Stansell v. Revolutionary Armed Forces of Colombia*, 704 F.3d 910 (11th Cir. 2013) (*Stansell I*); *Stansell v. Revolutionary Armed Forces of Colombia*, 771 F.3d 713 (11th Cir. 2014) (*Stansell II*); *Stansell v. Revolutionary Armed Forces of Colombia*, 772 F. App'x 772 (11th Cir. 2019) (*Stansell III*); *Stansell v. Lopez Bello*, 802 F. App'x 445 (11th Cir. 2020) (*Stansell IV*). In the

---

* The Honorable Michael L. Brown, United States District Judge for the Northern District of Georgia, sitting by designation.

first appeal—Case No. 20-11736—Samark López Bello and several limited liability companies he owns or controls (EPBC Holdings, 1425 Brickell 63-F, 1425 Brickell 46B, 1425 Brickell 64E, 200G PSA Holdings, Leucadendra 325, and MFAA Holdings) appeal the district court's orders directing certain garnishees to liquidate and/or distribute their assets to the plaintiffs who obtained the $318 million judgment.  In the second appeal—Case No. 20-12467—Mr. López and Leucadendra 325 appeal the denial of their motion for a preliminary injunction to stop the sale of real property located at 325 Leucadendra Drive in Coral Gables, Florida.  In the third appeal—Case No. 20-12545—Loisinette Leiva (Mr. López's wife) appeals the district court's denial of her motion to intervene in the proceedings concerning the sale of real property located at 325 Leucadendra Drive (and owned by Leucadendra 325, one of the appellants in Case Nos. 20-11736 and 20-12467).

In Case No. 20-11736, we conclude that a jury must decide whether Mr. López and his companies qualify as agencies or instrumentalities of the FARC such that their assets can be garnished by the plaintiffs to satisfy their $318 million judgment.  We therefore reverse and remand in that appeal.  In Case No. 20-12467, we dismiss the appeal as moot because 325 Leucadendra has been sold and we lack the ability to grant the requested relief. In Case No. 20-12545, we affirm the district court's order denying Ms. Leiva's motion to intervene as untimely and therefore dismiss the appeal.

## I[1]

As relevant here, § 201(a) of the Terrorism Risk Insurance Act of 2002, Pub. L. No. 107-297, codified as a note to 28 U.S.C. § 1610, provides that "[n]otwithstanding any other provision of law . . . the blocked assets of [a] terrorist party [against which a judgment is obtained] (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment."  In *Stansell II*, we set out the elements required under § 201(a) of the TRIA to execute on or attach the assets of a third party who is alleged to be an agency or instrumentality of a terrorist party.  The movant must prove (1) that he obtained a judgment against a terrorist party for a claim based on an act of terrorism, (2) that the amount sought to be executed or attached does not exceed the compensatory damages awarded to the movant, (3) that the assets of the third party are blocked (as that term is defined under the TRIA), and (4) that the third party is an agency or instrumentality of the terrorist party.  *See Stansell II*, 771 F.3d at 723.

## A

In February of 2017, the Office of Foreign Assets Control—acting pursuant to the Foreign Narcotics Drug Kingpin Act, 21 U.S.C. §§ 1901–08—determined that Mr. López was a "specially designated narcotics trafficker" (SDNT) based upon his provision of material assistance, financial support, or goods and services in

---

[1] In the rest of this opinion, we refer to the appellants in Case Nos. 20-11736 and 20-12467 collectively as the López appellants.

support of the drug-trafficking activities of Tareck Zaidan El Aissami Maddah (who served as the former Executive Vice-President of Venezuela and is now the current Minister of Oil & Industry and National Production of Venezuela).  The OFAC determined that Mr. López acted as a "key frontman" for Mr. El Aissami and his narcotics activities, identified a number of companies owned or controlled by Mr. López, and blocked the assets of Mr. López and those companies.  *See* Press Release, U.S. Dep't of the Treasury, *Treasury Sanctions Prominent Venezuelan Drug Trafficker Tareck El Aissami and His Primary Frontman Samark López Bello*, 2017 WL 563391 (Feb. 13, 2017); Bruce Zagaris, *U.S. Treasury Designates Venezuela's Vice President under Narco Kingpin Act*, 33 Int'l Enforcement L. Rep. 48 (Feb. 24, 2017).[2]

Two years later, in February of 2019, the plaintiffs who had obtained the $318 million judgment against the FARC filed an *ex parte* motion in the district court for writs of garnishment and execution against the assets of the López appellants (e.g.,

---

[2] We had held in *Stansell I*, 704 F.3d at 915–16, that assets frozen under the Kingpin Act were not "blocked assets" under the then-existing version of the TRIA.  But in 2018 Congress enacted the Anti-Terrorism Clarification Act, Pub. L. 115-253, 132 Stat. 3183, and as a result the Anti-Terrorism Act now provides that "blocked assets" under § 201 of the TRIA include the assets of a terrorist party (and the assets of any agency or instrumentality of that terrorist party) "seized or frozen" by the United States pursuant to the Kingpin Act.  *See* 18 U.S.C. § 2333(e).  In § 3(b) of the Anti-Terrorism Clarification Act, Congress further provided that this amendment to the Anti-Terrorism Act "shall apply to any judgment entered before, on, or after the date of enactment."  The López appellants do not contest the applicability of § 2333(e) in this case.

condominiums, vessels, and bank accounts).  They proceeded under § 201(a) of the TRIA and invoked Florida's garnishment and execution statutes, Fla. Stat. §§ 56.0101, 77.01 *et seq.*  On the merits, the plaintiffs asserted, through affidavits and other evidence, that the López appellants could be tied to the FARC through their connections with Mr. El Aissami.  The district court agreed with the plaintiffs, and found in an *ex parte* order that Mr. El Aissami and the López appellants were agencies or instrumentalities of the FARC.  *See* D.E. 22.

Upon receiving notice of the *ex parte* proceeding, the López appellants filed motions—with supporting lay and expert affidavits—to dissolve the writs of garnishment.  They made a number of arguments, including that the *ex parte* proceeding violated their due process rights and that the district court had erred in finding them to be agencies or instrumentalities of the FARC.  *See, e.g.,* D.E. 55, 80, 97.

The district court denied the López appellants' request to cancel the sale of several Miami-area properties, *see* D.E. 101, but referred to a magistrate judge the motion to dissolve the writs of garnishment with respect to bank accounts held by Mr. López.  The magistrate judge, following an evidentiary hearing, issued a report (a) recommending that the district court deny the motion to dissolve and (b) finding that the López appellants were agencies or instrumentalities of the FARC.  *See* D.E. 248.  The district court overruled the López appellants' objections and adopted the

magistrate judge's report.  *See* D.E. 279.  It later issued final turnover judgments as to the garnished assets.  *See* D.E. 339.

## B

In March of 2019, just after the plaintiffs filed their *ex parte* motions for writs of garnishment, a federal grand jury in New York returned an indictment against Mr. López charging him with violating OFAC sanctions by using bulk cash to pay for charter flights between Venezuela and Moscow.  *See United States v. López Bello*, Case No. 19-Cr-144 (S.D.N.Y).  Mr. López has not turned himself in or been arrested, and remains a fugitive.

The fugitive disentitlement doctrine, which is equitable in nature, "empowers courts to dismiss the lawsuits or appeals of fugitives from the law." *Ener v. Martin*, 987 F.3d 1328, 1331 (11th Cir. 2021) (citation omitted).  We asked the parties to discuss the doctrine at oral argument, and they did so.

Having considered the matter, we choose not to address whether the doctrine should apply.  The plaintiffs never asked the district court to invoke the doctrine, and that court therefore did not pass on it.  Our review on the application of the doctrine is for abuse of discretion, *see id.*, and under the circumstances we think it best for the district court to consider the matter on remand.  First, "[w]e are . . . a court of review, not a court of first view." *Callahan v. U.S. Dep't of Health & Hum. Servs.*, 939 F.3d 1251, 1266 (11th Cir. 2019) (citation omitted).  Second, one of the relevant factors is whether the litigant's fugitive status has a "sufficient connection"

to the present action, *see Ener*, 987 F.3d at 1332, and reasonable arguments can be made on both sides of that issue here.  Third, it is not clear whether the doctrine—even if applicable to Mr. López—would apply to his companies.  Fourth, we have cases going both ways as to whether the doctrine can and should apply to litigants who are defending civil lawsuits.  *Compare Pesin v. Rodriguez*, 244 F.3d 1250, 1252–53 (11th Cir. 2001) (applying the doctrine to a defendant in an action for return of a child under a statute implementing the Hague Convention), *with FDIC v. Pharaon*, 178 F.3d 1159, 1162 (11th Cir. 1999) ("We conclude that application of the fugitive disentitlement doctrine in this case to bar Appellant, a fugitive in a criminal case, from defending himself in a civil case, albeit a related one, would not be a 'reasonable response to the problems and needs that provoke[d]' the doctrine.") (citation omitted).

## II

The López appellants raise a number of arguments about the TRIA on appeal.  We address them below.[3]

---

[3] To the extent that the López appellants claim that the *ex parte* proceeding culminating in the initial writs of garnishment denied them due process, we rejected that argument in *Stansell IV*, 802 F. App'x at 448–49, and therefore do not address it further here.  As to any arguments not discussed in our opinion, we summarily affirm.

## A

Addressing an issue of statutory notice, we held in *Stansell II* that § 201 of the TRIA "does not preempt Florida [garnishment] law" with respect to post-judgment execution or attachment, and that "judgment creditors seeking to satisfy judgments under [§ 201] must follow the notice requirements of Florida law." 771 F.3d at 730. We also explained that in Florida "execution and garnishment proceedings are ancillary proceedings." *Id.* at 733 (citations omitted).

The López appellants, without acknowledging this aspect of *Stansell II*, argue that a post-judgment action brought pursuant to § 201 of the TRIA is a new and independent civil suit rather than an ancillary proceeding. Based on this premise, they then assert that the district court erred in failing to schedule a Rule 16 conference, refusing to enter a scheduling order, and allowing the plaintiffs to call Paul Craine (a former DEA agent) as one of their witnesses without prior disclosure. *See* Appellants' Br. at 22–26.

With respect to the lack of a Rule 16 conference and scheduling order, the López appellants have failed to identify any real harm or prejudice. There is therefore no basis for reversal. *See* 28 U.S.C. § 2111 ("On the hearing of any appeal . . . the court shall give judgment . . . without regard to errors or defects which do not affect the substantial rights of the parties."); Fed. R. Civ. P. 61 ("At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights."); *Palmer v. Hoffman*, 318 U.S. 109, 116 (1943) ("He who seeks to

have a judgment set aside because of an erroneous ruling carries the burden of showing that prejudice resulted.").  As for the admission of Mr. Craine's testimony at the evidentiary hearing without prior disclosure, it too does not require reversal because we are remanding for a jury trial.

## B

According to the López appellants, § 201(a) of the TRIA required the plaintiffs to prove that they were agencies or instrumentalities of the FARC at the time that the *ex parte* writs of garnishment were sought and issued (i.e., in February of 2019), and not at any earlier point in time.  Exercising plenary review as to this issue of statutory interpretation, *see Cho v. Surgery Partners, Inc.*, 30 F.4th 1035, 1040 (11th Cir. 2022), we disagree with the López appellants.

To recap, § 201(a) of the TRIA provides that "[n]otwithstanding any other provision of law . . . the blocked assets of [a] terrorist party [against which a judgment is obtained] (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment."  The López appellants contend that the phrase "shall be subject to execution or attachment" is "stated in the present, as the word 'shall' connotes the present," so the agency/instrumentality status must exist at the time the application for a writ of garnishment is filed.  *See* Appellants' Br. at 28.  They rely on language in *Kirschenbaum v. 650 Fifth Ave. & Related Props.*, 830 F.3d 107, 136 (2d Cir. 2016) (*Kirschenbaum I*) ("[I]nsofar as Plaintiffs contend that Alavi itself was

sufficiently owned, controlled, or directed by Iran to render it an agency or instrumentality of a terrorist party under the TRIA, questions of fact exist as to whether Alavi was so owned, controlled, or directed at the time Plaintiffs' complaints were filed."), *abrogated on other grounds by Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018).

A third party's assets must be blocked under the TRIA when the motion for a writ of garnishment is filed, and when the writ is issued. *See Stansell II*, 771 F.3d at 723, 748. But that does not mean that agency/instrumentality status must be determined as of that point in time.

The district court in *Stansell II* ruled that an agency or instrumentality was "[a]ny SDNT . . . that is *or was ever* involved" in any aspect of the FARC's narcotics trafficking operations "or that *assisted* the FARC's financial or money laundering network" because it "was either (1) materially assisting in, or providing financial or technological support for or to, or providing goods or services in support" of, the FARC's international narcotics trafficking activities; and/or (2) "owned, controlled, or directed by, or acting for or on behalf of" the FARC; and/or (3) "playing a significant role in" the FARC's narcotics trafficking. *See id.* at 724 n.6 (emphasis added). Although *Stansell II* did not address the specific temporal argument made by the López appellants, it did hold that "the district court developed a proper standard" for determining agency/instrumentality status under § 201(a) of the TRIA because that standard was based on the plain and ordinary meaning of those

terms. *See id.* at 732 (concluding also that "the agencies or instru-
mentalities here *were*, according to [the] OFAC, part of [the]
FARC's money laundering operations") (emphasis added). Be-
cause the formulation we expressly approved in *Stansell II* encom-
passed past involvement or association with a terrorist party, the
Second Circuit's language in *Kirschenbaum I*—if read the way the
López appellants suggest—is inconsistent with our precedent. We
conclude, based on *Stansell II*, that the magistrate judge and the
district court correctly rejected the contention that a third party
must be an agency or instrumentality of a terrorist party at the time
that execution or attachment is sought under the TRIA.[4]

We add two more linguistic points. First, contrary to the
assertion of the López appellants, the word "shall" does not neces-
sarily connote the present tense. "Depending on how finely [one]

---

[4] We are not sure how to read the language in *Kirschenbaum I* that the López
appellants rely on. In another portion of its opinion the Second Circuit used
both the past tense and the present tense in explaining agency/instrumentality
status under the TRIA. *See Kirschenbaum I*, 830 F.3d at 135 ("To demonstrate
that Defendants are 'agencies or instrumentalities' of a terrorist party under
the TRIA, . . . Plaintiffs must show that each Defendant (1) *was* a means
through which a material function of the terrorist party *is* accomplished,
(2) *provided* material services to, or on behalf of, or in support of the terrorist
party, *or* (3) *was* owned, controlled, or directed by the terrorist party.") (em-
phasis added). On remand the district court read the Second Circuit's lan-
guage just as the López appellants have, but its decision was later set aside on
other grounds. *See Kirschenbaum v. 650 Fifth Ave. Co.*, 257 F. Supp. 3d 463,
521 (S.D.N.Y. 2017) (*Kirschenbaum II*), *vacated sub nom.*, *Havlish v. 650 Fifth
Ave. Co.*, 934 F.3d 174 (2d Cir. 2019).

slice[s] the semantic nuances, *shall* can bear five to eight senses
even in a single document." Bryan A. Garner, Garner's Dictionary
of Legal Usage 952 (3d ed. 2011). Indeed, "shall" is "commonly
used as a future-tense modal verb." *Id. See also United States v.
Arredondo*, 31 U.S. 691, 741 (1832) ("In the English original, the
words are 'shall be'—words in the future."); *Carpenters Amended
& Restated Health Benefit Fund v. Holleman Constr. Co.,* 751 F.2d
763, 769 (5th Cir. 1985) (noting that "shall be subject" is a future-
tense phrase). Second, in a statute like § 201(a) of the TRIA, the
word "shall" is used in its usual "mandatory" legal sense. *See*
Black's Law Dictionary 1653 (11th ed. 2019); Webster's Third New
Int'l Dictionary of the English Language Unabridged 2085 (2002).
Because "shall" is used as a "command and statement of intention,"
it "adds nothing to clarify the temporal question before us." *Omni
MedSci, Inc. v. Apple, Inc.*, 7 F.4th 1148, 1154 (Fed. Cir. 2021).

## C

The López appellants make two additional arguments about
§ 201(a) of the TRIA. They assert that indirect ties are not enough
to establish that they were agencies or instrumentalities of the
FARC. And they maintain that they cannot be agencies or instru-
mentalities unless they acted knowingly. *See* Appellants' Br. at 34–
42.

We quickly dispense with the first argument. In *Stansell II*
we affirmed, as not clearly erroneous, the district court's factual
findings that certain third parties were agencies or instrumentali-
ties of the FARC. *See* 771 F.3d at 742, 746. In so doing, we

explained that as to some third parties the evidence was sufficient to establish the "required relationship between [the] FARC and [the third parties], even if that relationship was indirect." *Id.* at 742. *See also id.* at 746 ("Plaintiffs proffered evidence of connections to [the] FARC that met the district court's standard, and the appellants here failed to rebut that evidence."). *Accord Stansell v. Revolutionary Armed Forces of Colombia*, Case No. 10-471 (TJK), 2019 WL 4040680, at *4 (D.D.C. Aug. 26, 2019) (*Stansell V*) (agreeing with *Stansell II* that an indirect relationship suffices).

If that were not enough, nothing in § 201(a) of the TRIA suggests that an instrumentality relationship with a terrorist party needs to be direct. Imagine, for example, that the FARC hires A to oversee and coordinate the laundering of its narcotics proceeds in different parts of the world. Then A subcontracts, hires, or uses other individuals or entities (B, C, and D) to carry out the money laundering operation in other countries. In that example, B, C, and D could be (depending on the nature of the arrangement, agreement, or understanding) instrumentalities of the FARC notwithstanding their lack of a direct contractual relationship with the FARC.

The second argument—the one pertaining to knowledge—is one we did not address in *Stansell II*, and proves more difficult. The Second Circuit has left open whether, under § 201(a) of the TRIA, a person or entity must have known, or had reason to know, that it was providing services to or assisting a terrorist party to be considered an agency or instrumentality. *See Kirschenbaum I*, 830

F.3d at 136. In *Kirschenbaum II*, 257 F. Supp. 3d at 522, which was later vacated by the Second Circuit due to the improper exclusion of certain witnesses, *see Havlish*, 934 F.3d at 182–83, the district court explained that it did not need to decide the knowledge question because the evidence showed that the alleged agencies and instrumentalities in that case had the requisite knowledge. Nevertheless, in dicta the court said it did not believe knowledge was required:

> As a matter of law, . . . this Court does not believe knowledge of instrumentality status is a required element for a TRIA § 201(a) claim . . . . [G]enerally, agency principles prevent an agent from lacking knowledge as to its princip[al]. But people or entities may become the unwitting instruments of another. The fact that they may be, or are, unaware of their status as instruments does not eliminate their role as such. In this regard, an instrumentality may be passive[.]

*Kirschenbaum II*, 257 F. Supp. 3d at 523 (citations omitted). The court added that the "breadth and purpose" of § 201(a) indicated an intent on Congress' part "to cast a broad net to effectuate deterrence." *Id.* As far as we can tell, there is no other discussion of this knowledge question in any other cases or in the literature.

The pertinent phrase in § 201(a) of the TRIA is "agency or instrumentality." To figure out whether knowledge is required for either status, we must determine the "ordinary public meaning" of the words agency and instrumentality at "the time of enactment."

*United States v. Dominguez*, 997 F.3d 1121, 1124 (11th Cir. 2021) (citing *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1738 (2020)).

Around 2002, the words agency and instrumentality were largely understood as synonymous in lay usage. *See, e.g.,* 1 Shorter Oxford English Dictionary 41, 1391 (5th ed. 2002) (defining agency as an "[i]ntervening action towards an end" and instrumentality as "[a] thing which is employed for a purpose or end"); Webster's New World College Dictionary 25, 741 (4th ed. 2000) (defining agency as "that by which something is done; means; instrumentality" and instrumentality as "a means or agency"); Roget's II – The New Thesaurus 27, 551 (1988) (defining both words as "[t]hat by which something is accomplished or some end achieved"); Webster's New World Thesaurus 18 (1985) (defining agency, in part, as "[a]n instrumentality"). That lay understanding generally remains the same today. *See, e.g.,* Webster's Third New Int'l Dictionary 40, 1172 (2012) (defining agency as "a person or thing through which power is exerted or an end is achieved: instrumentality, means" and instrumentality as "something by which an end is achieved" or "something that serves as an intermediary or agent through which one or more functions of a controlling force are carried out") (capitalization altered); The American Heritage Dictionary of the English Language 32, 908 (4th ed. 2009) (defining agency as "[t]he means or mode of acting; instrumentality" and instrumentality as "[a] means; an agency").

In the legal world, however, the words were understood differently. Agency reflected a more formal fiduciary relationship

imposing certain duties and obligations, while instrumentality meant any means of accomplishing an end.  For example, the leading American legal dictionary at the time of the TRIA's passage defined agency as "[a] fiduciary relationship created by express or implied contract or by law, in which one party (the *agent*) may act on behalf of another party (the *principal*) and bind that party by words or actions."  Black's Law Dictionary 62 (7th ed. 1999).  That same dictionary defined instrumentality as [a] thing used to achieve an end or purpose," though it also provided an alternative definition which treated agency as a synonym ("[a] means or agency though which a function of another entity is accomplished").  *See id.* at 802.  Other legal sources also viewed agency and instrumentality differently.  *See* Merriam-Webster's Dictionary of Law 251 (1996) (defining "instrumentality" as "something through which an end is achieved or occurs"); Restatement (Second) of Agency § 1(1) (ALI 1958) ("Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act."); Bryan A. Garner, A Dictionary of Modern Legal Usage 38 (2d ed. 1995) ("An *agent* is a business representative who handles contractual arrangements between the principal and third persons.").

One lexicographer has put the legal understanding of agency this way: "Nonlawyers are largely unfamiliar with *agency* used in this way, although they understand the personal noun *agent* as meaning 'representative.'" Bryan A. Garner, Garner's Dictionary

of Legal Usage 38 (3d ed. 2011).  The difference between agency and instrumentality, in their legal senses, has generally remained consistent over time.  *See, e.g.,* I Bouvier Law Dictionary 109, 1340 (Desk ed. 2012) (defining agency as "the relationship between the principal and the agent" and instrumentality as "[a] means by which something is accomplished" and "the means by which something is achieved or performed").[5]

So which understanding governs?  Because Congress used the words agency and instrumentality in § 201(a) of the TRIA to permit the execution and attachment of assets, we think that the legal understanding is the better one.  A traditional canon of statutory construction is that terms joined by the disjunctive "or"—like agency and instrumentality here—have different meanings unless the context dictates otherwise.  *See, e.g., United States v. Woods*, 571 U.S. 31, 45 (2013); *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979); 1A Norman Singer, Sutherland on Statutes and Statutory Construction § 21.14 (7th ed. & Nov. 2021 update).  Using the legal understanding of these words here is textually appropriate and preferable because it prevents them from being superfluous to each other.  *See* Antonin Scalia & Bryan A. Garner, Reading Law: The

---

[5] The legal understanding of agency and instrumentality set out in the text is admittedly not uniform.  One legal dictionary, while defining agency in part as "a consensual fiduciary relationship in which one party acts on behalf of and under the control of another in dealing with third parties," also defines both agency and instrumentality in their lay sense as a person or thing through which "an end is achieved." *See* Merriam-Webster's Dictionary of Law 18, 249 (2016).

Interpretation of Legal Texts 176 (2012) ("Because legal drafters should not include words that have no effect, courts should avoid a reading that renders some word altogether redundant.").  With this premise, we turn to whether knowledge is required for agency or instrumentality status.

We begin with agency.  When the TRIA was enacted in 2002, an agency relationship generally required both (1) a "manifestation by the principal to the agent that the agent may act on his account," and (2) "consent by the agent to so act." Restatement (Second) of Agency, at § 15.  *See also id.* at cmt. b ("The agency relation[ship] exists only if the agent consents to it."); John Bourdeau et al., 3 Am. Jur. 2d Agency § 14 (2d ed. & May 2022 update) ("As between the parties to the relationship, there must be a meeting of the minds in establishing the agency, and the consent of both the principal and the agent is necessary to create an agency relationship although such consent may be implied rather than expressed.").  Given that consent (i.e., agreement) by the agent was (and is) required, and that consent "usu[ally]" is given by a person "who has knowledge or understanding," Merriam-Webster's Dictionary of Law, at 97, it seems to us that an agent must know (or at least be aware of) the identity of his principal in order to create an agency relationship. *See also* I Bouvier Law Dictionary, at 532 (defining consent as "the knowing and intentional act of acceptance or agreement to a proposition"); *Kirschenbaum II*, 257 F. Supp. 3d at 523 (stating in dicta that "generally, agency principles prevent an agent from lacking knowledge as to its princip[al]").  We

hold, therefore, that to be an agency of a terrorist party under § 201(a) of the TRIA one must know the identity of the terrorist party with whom the agent-principal relationship exists.[6]

We recognize, of course, that we are using domestic understandings of the word agency to interpret the TRIA, which has international application given the breadth and geographic scope of terrorist activity.  And we realize as well that in the world of terrorism, affiliations and relationships are not likely to track the formalisms of law.  But we are tasked with interpreting a domestic statute, and we think that Congress used agency in its legal sense in § 201(a).  And because execution or attachment under the TRIA must occur in the United States, courts should be able to apply the understanding of agency we have set out.

On then, to instrumentality, as to which we reach a different conclusion.  As noted above, in a legal sense an instrumentality is a person or thing through which or by which some end or purpose is achieved. We have found no indication that to be an instrumentality one must know the person or entity seeking the end result. To the contrary, the word has been used to refer to unwitting cogs in a criminal scheme.  *See, e.g., United States v. Bachynsky*, 949 F.2d 722, 735 (5th Cir. 1991) ("For each false diagnosis submitted,

---

[6] In our view, the mistake made by the district court in *Kirschenbaum II* (albeit in dicta) was lumping agency and instrumentality together and treating them as meaning the same thing.  As we have hopefully explained in the text, the words have distinct legal meanings, and those different understandings lead to divergent results with respect to whether knowledge is required.

an unwitting patient was made an instrumentality of the fraud."); Michael N. Giuliano, 22 C.J.S. Criminal Law: Substantive Principles § 170 (May 2022 update) ("Ordinarily, a person who causes a crime to be committed through the instrumentality of an innocent or unwitting agent is punishable as a principal.").

In enacting the TRIA after the terrorist attacks on September 11, 2001, Congress found that the government should provide "temporary financial compensation" to parties injured by acts of terrorism. *See* TRIA § 101(a)(6) (congressional findings). The express purpose of the TRIA was to establish a temporary federal program "that provides for a transparent system of shared public and private compensation for insured losses resulting from acts of terrorism." TRIA § 101(b) (congressional purpose). We conclude that this goal is furthered by allowing the execution and attachment of assets belonging to instrumentalities who were unaware of the terrorist party or parties involved. Permitting such execution and attachment makes it easier for victims of terrorism to collect on judgments obtained against terrorist organizations. And it eases the financial pressure on private insurance markets and better allows the industry to "absorb any future losses." *See* TRIA § 101(b)(2). In this respect, therefore, we agree with the dicta in *Kirschenbaum II* that knowledge is not required for instrumentality status under the TRIA. *See* 257 F. Supp. 3d at 523 ("The fact that they may be, or are, unaware of their status as instrument[alitie]s does not eliminate their role as such. In this regard, an instrumentality may be passive[.]").

When the case returns to the district court for a trial—more on that later—the court will have to instruct the jury on agency and instrumentality consistent with *Stansell II* as supplemented by today's opinion. And it will need to explain that under the TRIA knowledge is required for agency status but not for instrumentality status.

## D

The López appellants contend that they will be denied due process unless we require knowledge for both agency and instrumentality status under § 201(a) of the TRIA, and urge us to impose a knowledge requirement in order to avoid constitutional problems. *See* Appellants' Br. at 40–43. We have held that knowledge is not required for instrumentality status, so we limit our discussion to that status.

In the criminal arena, the Supreme Court has not "undertaken to delineate a precise line or set forth comprehensive criteria for distinguishing between crimes that require a mental element and crimes that do not." *Staples v. United States*, 511 U.S. 600, 620 (1994) (citation and internal quotation marks omitted). Just ten years ago, we noted the lack of clarity in this area of the law. *See Shelton v. Sec'y, Dep't of Corr.*, 691 F.3d 1348, 1354–55 (11th Cir. 2012).

The TRIA, however, is not a criminal provision. Instead, § 201(a) is a civil remedy providing for the execution and attachment of assets to satisfy certain judgments against terrorist parties.

And in the civil context, the Supreme Court has held that Congress can impose liability without requiring knowledge.  In *Chicago, Burlington & Quincy Ry. Co. v. United States*, 220 U.S. 559 (1911), a railroad company challenged the assessment of a penalty for the violation of a federal safety law and argued in part that it could not be held responsible because it lacked knowledge of the violation. Explaining that the action to impose the penalty was "a civil one," the Supreme Court rejected the railroad's argument: "The power of the legislature to declare an offense, and to exclude the elements of knowledge and due diligence from any inquiry as to its commission, cannot, we think, be questioned." *Id.* at 578.

We too have rejected the argument that, as a constitutional matter, a civil penalty requires actual knowledge on the part of the person or entity involved.  *See Mayers v. U.S. Dep't of Health & Hum. Servs.*, 806 F.2d 995, 999–1000 (11th Cir. 1986).  Other circuits have come to similar conclusions.  *See, e.g., Bettor Racing, Inc. v. Nat'l Indian Gaming Comm'n*, 812 F.3d 648, 652 (8th Cir. 2016) ("Nor is scienter required to justify a fine."); *Conn. Bar Ass'n v. United States*, 620 F.3d 81, 102 (2d Cir. 2010) ("Strict liability generally raises due process concerns with respect to criminal, not civil, statutes."); *Humanitarian L. Project v. U.S. Treasury Dep't*, 578 F.3d 1133, 1152 (9th Cir. 2009) ("[C]ivil penalties may be imposed without *mens rea* requirements because they are indeed civil."); *N. Wind, Inc. v. Daley*, 200 F.3d 13, 19 (1st Cir. 1999) ("As a general matter, scienter is not required to impose civil penalties

for regulatory violations when the regulation is silent as to state of mind.").

The López appellants do not acknowledge or discuss these cases. Nor do they provide a convincing argument as to why we can or should deviate from them.  We therefore reject their argument that due process demands a knowledge requirement for instrumentality status under the TRIA.

## III

As we explained in *Stansell II*, the TRIA does not preempt Florida garnishment law.  *See* 771 F.3d at 730 ("[T]he district court erred when it held that Florida law did not govern the garnishment and execution procedures.").  Because the plaintiffs here invoked Florida's garnishment statutes to attach the assets of the López appellants under § 201(a) of the TRIA, they and the district court had to adhere to those statutes.

The López appellants assert that under Florida law the district court erred in denying them a jury trial on the issues of agency and instrumentality.  *See* Appellants' Br. at 34–54.  On the record before us, we agree.

## A

The López appellants, who were contesting the *ex parte* garnishments, "were entitled to be heard on their challenge to the agency or instrumentality issue."  *Stansell II*, 771 F.3d at 727.  One of the Florida garnishment statutes provides that "[o]n demand of either party a jury summoned from the body of the county shall be

impaneled to try the issues." Fla. Stat. § 77.08. This statute provides a "right to jury trial in a garnishment proceeding," though a "motion for summary judgment . . . is . . . permissible" if "there is no disputed issue of material fact." *Sec. Bank, N.A. v. BellSouth Advert. & Publ'g Corp.*, 679 So. 2d 795, 800 n.5 (Fla. 3d Dist. Ct. App. 1996). *See also Zelaya/Cap. Int'l Judgment, LLC v. Zelaya*, 769 F.3d 1296, 1304 (11th Cir. 2014) (explaining that a "jury trial [under § 77.08] is not required . . . if it would serve no purpose").

In the district court, the López appellants argued that the agency/instrumentality issues should be submitted to a jury under § 77.08. *See, e.g.,* D.E. 230 at 208. The magistrate judge concluded, and the district court agreed, that the plaintiffs had met their burden under the TRIA and that there were no material issues of fact with respect to Mr. López's status as an agency or instrumentality of the FARC. *See* D.E. 248 at 21–23; D.E. 279 at 2.

The question for us, then, is whether the evidence presented created issues of material fact as to Mr. López's agency or instrumentality status. If so, a jury trial was required. *See, e.g., Allen v. Brevard Cnty. Loan & Mortg. Co.*, 158 So. 305, 306 (Fla. 1934) (reversing judgment in favor of garnishee and remanding for a jury trial because there was "conflicting evidence" as to whether the garnishee was indebted to the judgment debtor). In this respect, we note that under both federal law and Florida law summary judgment should be denied where conflicting inferences can be drawn from the evidence, even if the evidence itself is not in dispute. *See Manners v. Cannella*, 891 F.3d 959, 967 (11th Cir. 2018);

*Burroughs Corp. v. Am. Druggists' Ins. Co.*, 450 So. 2d 540, 544 (Fla. 2d Dist. Ct. App. 1984).

The plaintiffs, who sought garnishment under § 201(a) of the TRIA, bore the burden in the dissolution proceeding of establishing that the López appellants were agencies or instrumentalities of the FARC.  This is the burden-of-proof allocation under both Florida garnishment law and the TRIA.  *See* Fla. Stat. § 77.07(2) (on a motion to dissolve a writ of garnishment "if the allegation in the plaintiff's motion which is denied is not proved to be true, the garnishment shall be dissolved"); *Kirschenbaum II*, 257 F. Supp. 3d at 515 (addressing the TRIA); *Harrison v. Republic of Sudan*, Case No. 13-cv-3127 (PKC), 2017 WL 946422, at *3 (S.D.N.Y. Feb. 10, 2017) (addressing the TRIA).  *Cf. Rubin v. Islamic Republic of Iran*, 810 F. Supp. 2d 402, 404 (D. Mass. 2011) (explaining that under Massachusetts law the plaintiff seeking post-judgment attachment has the burden to show entitlement to the assets in question, and concluding that "[t]here is no reason, textual or otherwise, to conclude that [the] TRIA shifts this burden of proof away from the plaintiff"), *aff'd*, 709 F.3d 49 (1st Cir. 2013).[7]

---

[7] Like the parties, we assume that the preponderance of the evidence standard governs in a Florida garnishment dissolution proceeding involving the TRIA. *See Grogan v. Garner*, 498 U.S. 279, 286 (1991) ("'[W]e presume that [the preponderance of the evidence] standard is applicable in civil actions between private litigants unless 'particularly important individual interests or rights are at stake.'") (citation omitted); *S. Fla. Water Mgmt. Dist. v. RLI Live Oak, LLC*, 139 So. 3d 869, 872 (Fla. 2014) (same); Paul M. Coltoff et al., 38 C.J.S.

As a reminder, we repeat the substantive TRIA standard we approved in *Stansell II*. An agency or instrumentality is "any SDNT . . . that is or was ever involved" in the FARC's narcotics trafficking operations "or that assisted the FARC's financial or money laundering network" because it "was either (1) materially assisting in, or providing financial or technological support for or to," or "providing goods or services in support of," the FARC's international narcotics trafficking activities; and/or (2) "owned, controlled, or directed by, or acting for or on behalf of" the FARC; and/or (3) "playing a significant role in" the FARC's narcotics trafficking. *See Stansell II*, 771 F.3d at 724 n.6, 732. And, as discussed earlier, knowledge is required for agency status but not for instrumentality status.

We held in *Stansell II* that an "indirect" relationship can suffice to meet this standard, but did not elaborate further on what such a relationship consists of. *See id.* at 742. Common sense indicates, however, that the more attenuated the link the more difficult it will be to prove agency/instrumentality status. To use a pop culture analogy, the mere associations used in the game "Six Degrees of Kevin Bacon"—which involves linking American actor Kevin Bacon to other actors via their roles in six film titles or less—would not suffice under § 201 of the TRIA. *Cf.* David Colker, "Six

_____

Garnishment § 259 (May 2022 update) (in a garnishment proceeding the judgment creditor "must prove the allegations by a preponderance of the evidence").

Degrees of Bacon Separation," *L.A. Times* (June 18, 1996) ("One of [Elvis] Presley's films was 'Viva Las Vegas' (1964), which also featured Ann-Margret. Ann-Margret appeared in 'Carnal Knowledge' (1971) with Jack Nicholson. And Nicholson was in 'A Few Good Men' (1992) with Bacon. It took three films to make the connection, so Presley can be said to have a Bacon number of 3.").

## B

The plaintiffs' agency/instrumentality theory in the district court was based on a series of indirect connections. As the plaintiffs told the magistrate judge, "we have acknowledged from the outset that we were trying to prove up an indirect relationship." D.E. 230 at 204.

As summarized by the magistrate judge, the plaintiffs' evidence showed the following. First, according to the OFAC Mr. López—an SDNT—operated as the "frontman" or *testaferro* for Mr. El Aissami—also an SDNT. Second, Mr. López laundered and moved money for Mr. El Aissami (1) flowing to the latter as a result of his ties to and membership in the Cartel of the Suns and (2) derived from the sale of cocaine manufactured by the FARC. Third, the Cartel of the Suns earned significant income from the sale and exportation of FARC cocaine, and high-ranking members of the Cartel safeguarded cocaine-producing laboratories and helped escort drug shipments from Colombia into Venezuela. *See* D.E. 248 at 18–19, 22. According to the magistrate judge, whose report was adopted by the district court, Mr. El Aissami was "the key link in the chain," and Mr. López's connections to him went

"unrebutted." *Id.* at 19. As an example, the magistrate judge pointed to evidence that Mr. El Aissami provided protection to Daniel Barrera Barrera, a Colombian drug lord who was designated as an SDNT in part due to his partnership with the FARC. *See id.* at 19–20 ("López Bello's connection to El Aissami, and El Aissami's connection to the FARC through Barrera Barrera, entirely undermines any serious argument that López Bello cannot be connected to the FARC, at least indirectly.").

The magistrate judge and the district court, as noted earlier, concluded that there were no material issues of fact as to whether Mr. López was an agency or instrumentality of the FARC. Although we understand why they viewed the evidence as supporting the plaintiffs' position, under § 77.08 they were not tasked with being the ultimate triers of fact. As we see the record, the evidence presented by the López appellants created issues of material fact and necessitated a jury trial. We recount that evidence in the light most favorable to them. *See Scott v. Harris*, 550 U.S. 372, 378 (2007).

William Marquardt, a forensic accountant and director for Berkeley Research Group (BRG), was the first expert witness for the López appellants. He testified (1) that the 2017 OFAC determination of Mr. López as an SDNT did not mention the FARC; and (2) that he performed a data analysis comparing an OFAC list of individuals associated with the FARC but was unable to link any of those individuals to Mr. López or his companies (including the directors, officers, shareholders, and managers of those companies).

*See* D.E. 230 at 20, 22.  He opined, therefore, that none of the persons the OFAC directly tied to the FARC were connected, linked, or associated with Mr. López or any of his companies.  *See id.* at 23.

The López appellants' second expert witness was Ernesto Carrasco Ramirez, a Colombian attorney who specialized in criminal law and served as a director of BRG.  While in Colombia, he worked for the Solicitor General's Office (from 1991 to 1994) and the Attorney's General's Office (from 1994 to 1998).  In the latter position he served as the Director of the National Prosecutors' Office for a year or so and learned about the FARC and its activities.  *See id.* at 32–35.  In later jobs in the private sector, such as with Kroll International in Mexico City and ON Partners in Colombia, he maintained contacts with Colombian government sources who had information related to the FARC.  *See id.* at 37–38.

Mr. Carrasco did not meet or interview Mr. López.  *See id.* at 51.  Based on his "personal knowledge" and contact with sources, however, he was "unable to establish any direct or indirect link between [Mr.] López . . . and the FARC."  *Id.* at 39.  *See also id.* at 45 ("[T]here is no connection between [Mr.] López . . . and [the] FARC.").  With respect to the Cartel of the Suns—whom he described as a "group of Venezuelan generals and probably high-ranking officers" of the Chavez and Maduro regimes "dedicated to drug trafficking"—he testified that there was a "close link" between the FARC and the Chavez regime with the Cartel of the Suns "at an intellectual and political level."  *Id.* at 44.  But he did "not

identify the connection between [Mr.] López . . . and the Cartel [of the Suns]." *Id.*

The López appellants also introduced the declarations of Mr. López and of Richard Gregorie. The plaintiffs objected on the ground that those two individuals were not present at the evidentiary hearing, but the magistrate judge overruled the objection, and the district court did not disturb that ruling. *See id.* at 52.[8]

In his first declaration, made under penalty of perjury, Mr. López stated based on "personal knowledge" that he never "directly or indirectly . . . [was] associated with[,] provided material assistance to[,] engaged in financial transactions with[,] or supported in any way, financially, logistically, or otherwise, the FARC." D.E. 113-1 at ¶¶ 2, 7. He made the same statements of denial with respect to his companies. *See id.* at ¶¶ 8–13. In his second declaration, made under penalty of perjury and pursuant to 28 U.S.C. § 1746, Mr. López reiterated that the statements in his first declaration were factual and based on his personal knowledge. *See* D.E. 149 at ¶ 6. He then stated, again based on "personal knowledge," *see id.* at ¶ 12, the following:

---

[8] It seems to us that the magistrate judge's evidentiary ruling was correct. As far as we know, there is no requirement that witnesses provide live testimony at the summary judgment phase of a case. Things might have been different if the parties had engaged in reciprocal discovery and the plaintiffs were unable to depose Mr. López or Mr. Gregorie, but here there was no discovery.

♦ "I am not, nor have I ever been[,] involved in narcotics
drug trafficking."

♦ "I am not, nor have I ever been, a frontman for Tareck El
Aissami."

♦ "I am not, nor have I ever been, a member of the Cartel of
the Suns."

♦ "I have not, nor have I ever, laundered drug proceeds for
Tareck El Aissami."

*Id.* at ¶¶ 8–11.

Mr. Gregorie, a managing director of BRG, worked for the
Department of Justice for 42 years and handled a number of com-
plex prosecutions, including those of leaders of the Medellin and
Cali drug cartels.  While at the U.S. Attorney's Office in the South-
ern District of Florida, he served as the Chief of Narcotics and the
Chief of the Criminal Division.  *See* D.E. 97-3 at 1.  In his declara-
tion, submitted under penalty of perjury and pursuant to § 1746,
Mr. Gregorie explained that he had reviewed the 2017 OFAC press
release designating Mr. López an SDNT and the affidavits of the
plaintiffs' experts.  Based on that review, he opined (1) that the al-
legations in the OFAC designation were "unsupported;" (2) that
there was no evidence, source, or document demonstrating that
Mr. López (a) was ever involved in a narcotics transaction, (b) ever
conducted a transaction with a member of the FARC, or (c) ever
had any relationship with a member of the FARC; and (3) that the
Cartel of the Suns, a Venezuelan organization, is not the FARC.
*See id.* at 2.

This evidence, viewed collectively and taken in the light most favorable to the López appellants, created material issues of fact as to whether Mr. López and his companies were agencies or instrumentalities of the FARC.  Take Mr. López's two declarations.  Though the declarations were self-serving and uncorroborated, the factual statements in them were based on personal knowledge, as Mr. López would know whether he was ever a frontman for Mr. El Aissami, or whether he ever laundered narcotics proceeds for him, or whether he ever associated with someone from the FARC or the Cartel of the Suns.  Those statements therefore had to be accepted as true at summary judgment.  *See United States v. Stein*, 881 F.3d 853, 857–58 (11th Cir. 2018) (en banc).  Even if we ignored Mr. López's declarations, the testimony of Mssrs. Marquardt, Carrero, and Gregorie created issues of material fact.  Together, they opined that that Mr. López was not involved in narcotics trafficking, and that they could find no direct or indirect connection between Mr. López (or his companies) and the FARC, its members, or the Cartel of the Suns.

To tie the bow, we also note that during cross-examination at the evidentiary hearing each of the plaintiffs' own experts provided some testimony which permitted inferences supporting the position of the López appellants.  First, Douglas Farah and Paul Craine acknowledged that they had not reviewed the financial statements or transactions of any of Mr. López's companies.  *See* D.E. 230 at 91–92, 188.  So even if Mr. López were individually characterized as an agency or instrumentality of the FARC, it is not

apparent that the companies also had that status.  Second, Mr.
Farah and Luis Cote Gómez conceded that the OFAC did not link
Mr. El Aissami to the FARC, did not tie Mr. López and his compa-
nies to the FARC, and did not connect Mr. López to the Cartel of
the Suns.  *See id.* at 101–02, 124–25.  Third, when asked by the mag-
istrate judge whether "Mr. El Aissami's activities also relate to po-
tential things that have nothing directly to do with the FARC,"
such as corruption in the Venezuelan oil industry, Mr. Craine an-
swered "[y]es, potentially."  *Id.* at 190.  And he admitted that crimes
like embezzlement of government funds would not relate "directly
to the FARC."  *Id.* at 191.

In sum, we conclude that the evidence, viewed in the light
most favorable to the López appellants, presented a jury question
on their agency/instrumentality status under § 201(a) of the TRIA.

## IV

Two of the consolidated appeals—Case Nos. 20-12467 & 20-
12545—concern the attachment and sale of real property located at
325 Leucadendra Drive in Coral Gables, Florida.

## A

In Case No. 20-12467, Mr. López and Leucadendra 325 ap-
peal the district court's denial of their motion for a preliminary in-
junction to prevent the sale of the property.  In their initial brief,
Mr. López and Leucadendra 325 contend that they are also appeal-
ing the district court's July 6, 2020, order denying their motion to
strike the writ of execution on the property.  *See* Appellants' Br. at

10. But the notice of appeal in this case was never amended to include the July 6th order. Instead, the appeal of that order resulted in the opening of a separate case, which Mr. López and Leucadendra 325 voluntarily dismissed in September of 2020. *See Stansell v. Revolutionary Armed Forces of Colombia*, No. 20-12888 (11th Cir.) (notice of appeal filed Jul. 30, 2020). So this appeal—Case No. 20-12467—concerns only the order denying Mr. López's and Leucadendra 325's motion for a preliminary injunction to prevent the sale of the property.

Mr. López and Leucadendra 325 argue that the district court erred in failing to stop the sale. *See* Appellants' Br. at 55–57. Because that sale took place and the property was sold to a third party, we cannot grant the requested relief (i.e., preventing the sale). *Cf. United States v. Certain Real & Pers. Prop. Belonging to Hayes*, 943 F.2d 1292, 1296 (11th Cir. 1991) ("The sale of the property to a third-party purchaser has terminated this Court's ability to grant the claimant her requested remedy, the return of her one-half interest in the property."). Their appeal, then, is moot, and we must dismiss it. *See Bender v. CenTrust Mortg. Corp.*, 51 F.3d 1027, 1029 (11th Cir. 1995) (holding that the appeal of a "request for a preliminary injunction to enjoin [a] sale" is moot where the sale to a third party has already taken place).[9]

---

[9] Although Mr. López and Leucadendra 325 also request that we "order [the appellees] to pay [them] the entire proceeds of the [s]ale," Appellants' Br. at 57, that relief pertains to the district court's July 6th order, which as we have explained is not at issue here.

## B

On July 2, 2020, after the district court denied the motions of Mr. López and Leucadendra 325 to stop the sale of the property located at 325 Leucadendra Drive, but before the sale, Ms. Leiva—Mr. López's wife—filed a motion to intervene as of right under Rule 24(a)(2) with respect to that property. She asserted that, "on behalf of [the] LLP Trust," she was the owner of 9.95% of the companies "which in turn" owned the property. She argued that she was not an agency or instrumentality of the FARC, and that as a result her 9.95% interest was not subject to execution or attachment under the TRIA. She asked the court to not distribute the proceeds of the sale to the plaintiffs until it determined her interest in the property. *See* D.E. 406 at 1, 3 (motion); D.E. 406-1 at 2–10 (memorandum of law).

The district court denied Ms. Leiva's motion to intervene as untimely. First, the court explained that Mr. López and his counsel ("and presumably [Ms.] Leiva") knew as of February of 2017 that the OFAC had blocked the property at 325 Leucadendra Drive and knew as of March of 2020 that a writ of execution had been issued against that property. Second, the same counsel who represented Mr. López represented Ms. Leiva. Third, although Mr. López had filed numerous motions with respect to the property since that time, none of the motions "mentioned that his wife own[ed] an interest in the property." D.E. 413 at 2 & n.1. Because Ms. Leiva had

raised her alleged ownership interest at the "eleventh" hour, her motion was untimely. *See id.* at 2.[10]

Generally speaking, the denial of a motion to intervene is not a final order. Nevertheless, we have provisional appellate jurisdiction to review the district court's denial of Ms. Leiva's Rule 24(a)(2) motion to intervene under the so-called "anomalous rule." *See, e.g., Fox v. Tyson Foods, Inc.*, 519 F.3d 1298, 1301 (11th Cir. 2008). "If we find that the district court's disposition of the motions to intervene was correct, then our jurisdiction evaporates[.]" *Chiles v. Thornburgh*, 865 F.2d 1197, 1212 (11th Cir. 1989).

Our review of a timeliness determination under Rule 24 is for abuse of discretion. *See Comm'r, Ala. Dep't of Corr. v. Advance Loc. Media, LLC*, 918 F.3d 1161, 1170 (11th Cir. 2019). "[T]he abuse of discretion standard allows a range of choice for the district court, so long as that choice does not constitute a clear error of judgment." *In re Rasbury*, 24 F.3d 159, 168 (11th Cir. 1994) (internal quotation marks and citation omitted).

To intervene as of right pursuant to Rule 24(a)(2), a movant must show (1) that her request is timely; (2) that she has an interest

---

[10]Although the district court denied Ms. Leiva's motion to intervene, it afforded her two weeks to seek an appellate stay. *See* D.E. 421. Pending our consideration of her motion for a stay, the district court ordered the plaintiffs' attorneys to hold 9.95% of the sale proceeds in their trust account. If Ms. Leiva failed to obtain a stay in that time, the funds were to be disbursed. Ms. Leiva did not file her motion for a stay until the thirteenth day of that fourteen-day period. We denied a stay, and the funds were ultimately disbursed.

relating to the property or transaction that is the subject of the action; (3) that "[s]he is so situated that disposition of the action, as a practical matter, may impede or impair h[er] ability to protect that interest"; and (4) that her interest is not adequately represented by parties to the action. *See Lloyd v. Ala. Dep't of Corr.*, 176 F.3d 1336, 1339–40 (11th Cir. 1999). Ms. Leiva argues that her motion was timely because (a) her interests were protected by Mr. López and Leucadendra 325 until the district court denied their motions to stop the sale of the property, and (b) she did not seek to delay the sale and instead asked only that the proceeds not be distributed until her interest in the property could be adjudicated.

Ms. Leiva's interests were not, in fact, adequately represented by Mr. López and Leucadendra 325. They were challenging the attachment to and sale of the property on the grounds that Mr. López was not an agency or instrumentality of the FARC. Ms. Leiva's claim to the property did not rest on those grounds. Her position was that, regardless of Mr. López's status as an agency or instrumentality of the FARC, she herself was not such an agency or instrumentality, and as a result had a right to a portion of the sale proceeds equal to her partial ownership interest. In other words, she was attempting to assert a defense akin to an innocent owner defense under the TRIA.[11]

_____

[11] Given our resolution, we have no occasion to pass on the existence of such a defense under the TRIA or its application to Ms. Leiva's case. *See generally Estate of Levin v. Wells Fargo Bank, N.A.*, --- F.4th ----, No. 21-7036, 2022 WL

Ms. Leiva's claim to the property was also factually distinct from that of Mr. López and Leucadendra 325.  Her motion acknowledged that the district court would need to consider and adjudicate whether she had an interest in the property before the sale proceeds could be fully disbursed.  The court would have had to parse through a series of real property transactions and stock transfers involving four different legal entities that Ms. Leiva described in her motion—none of which were at issue in the proceedings as litigated by Mr. López and Leucadendra 325.[12]

─────────────────

3364493, at *6 (D.C. Cir. Aug. 16, 2022) ("[B]locked funds can be attached [under the TRIA] only if no intermediary or upstream bank asserts an interest as an innocent third party."); *United States v. All Funds on Deposit with R.J. O'Brien & Assocs.*, 783 F.3d 607, 620–21 (7th Cir. 2015) (finding that "there are no . . . limit[s]" to the scope of the "notwithstanding" clause in the TRIA and holding that the broadness of the clause "supersedes the innocent ownership requirement of civil forfeiture"); *Kirschenbaum I*, 830 F.3d at 136 (noting without deciding that an innocent owner defense may be available under the TRIA); *Kirschenbaum v. Assa Corp.*, 934 F.3d 191, 199 n.9 (2d Cir. 2019) ("declin[ing] to decide whether TRIA has . . . an innocent-owner defense"); *Kirschenbaum II*, 257 F. Supp. 3d at 524 ("find[ing] that the concept of an 'innocent owner' is . . . inapplicable to TRIA § 201(a) as a matter of law"); *Stansell v. Revolutionary Armed Forces of Colombia*, No. 09-cv-2308, 2013 WL 12203820, at *5 (M.D. Fla. Apr. 19, 2013) (*Stansell VI*) ("No other parties, claimants, property owners, or 'innocent' beneficiaries have rights greater that the terrorism victim judgment holders and these rights are not considered in the TRIA statutory scheme.") (citation omitted).

[12] We acknowledge that there "are circumstances in which post-judgment intervention may be justified." *Howse v. S/V Canada Goose I*, 641 F.2d 317, 320 (5th Cir. Unit B 1981).  For example, we reversed the denial of a motion

We conclude that Ms. Leiva was aware that her "rights could be adversely affected" from the time the U.S. Marshal levied the writ of execution against the property. *See United States v. Jefferson Cnty.*, 720 F.2d 1511, 1516 (11th Cir. 1983). She knew at that time (at least as early as March of 2020) that her interests were not aligned with and thus not protected by Mr. López and 325 Leucadendra. As such, she could and should have intervened in the proceedings earlier, and sooner than five days prior to the scheduled sale. Because the district court did not abuse its discretion in denying her motion as untimely under these circumstances, we affirm its order. *Cf. FDIC v. Hanrahan*, 612 F.2d 1051, 1053 (7th Cir. 1980)

---

to intervene as untimely in *FTC v. American Legal Distributors, Inc.*, 890 F.2d 363, 365–66 (11th Cir. 1989). The circumstances in *American Legal Distributors*, however, differed from those here. First, in that case we noted that timeliness is not an "automatic barrier . . . in post-judgment proceedings where substantial problems in formulating relief remain to be resolved." *Id.* at 365 (internal quotation marks omitted). Here, however, the district court did not have "substantial problems" to resolve with respect to the property at the time that it denied Ms. Leiva's motion to intervene. Second, the FTC, the party who could have opposed intervention in *American Legal Distributors*, did not oppose it for the limited purpose sought. *See id.* In contrast, intervention here was contested. Third, in *American Legal Distributors* we reversed the denial of the motion to intervene only as it "relat[ed] to the future sale and distribution of the frozen assets," and affirmed the district court's order as to assets for which sale had already been authorized. *See id.* Ms. Leiva sought to intervene regarding an asset for which a sale date had been set and was scheduled to take place just days later. So *American Legal Distributors* does not compel reversal here. In any event, Ms. Leiva failed to assert that she was relying on *American Legal Distributors* in the district court, and she did not cite or rely on that case on appeal.

(holding that wife's motion to intervene, which was filed 49 days after the date of attachment of husband's interest in jointly held property under a contract for sale, was untimely).  Our jurisdiction therefore evaporates, and we dismiss Ms. Leiva's appeal.  *See Chiles*, 865 F.2d at 1212.

## V

In Case No. 20-11736, we reverse the turnover judgments because there are issues of fact as to whether Mr. López and his companies are or were agencies or instrumentalities of the FARC. In Case No. 20-12467, we dismiss the appeal of Mr. López and Leucadendra 325 as moot.  In Case No. 20-12545, we agree with the district court that Ms. Leiva's motion to intervene was untimely and dismiss the appeal.  The case is remanded to the district court for further proceedings consistent with our opinion.

**AFFIRMED** in part, **DISMISSED** in part, and **REVERSED AND REMANDED** in part.

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

August 23, 2022

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  20-11736-GG   ; 20-12467 -GG   ; 20-12545 -GG
Case Style:  Keith Stansell, et al v. Samark Jose Lopez Bello
District Court Docket No:  1:19-cv-20896-RNS

Electronic Filing
All counsel must file documents electronically using the Electronic Case Files ("ECF") system,
unless exempted for good cause. Although not required, non-incarcerated pro se parties are
permitted to use the ECF system by registering for an account at www.pacer.gov. Information
and training materials related to electronic filing are available on the Court's website. Enclosed
is a copy of the court's decision filed today in this appeal. Judgment has this day been entered
pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP
41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for
filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise
provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is
timely only if received in the clerk's office within the time specified in the rules. Costs are
governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for
attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested
Persons a complete list of all persons and entities listed on all certificates previously filed by
any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be
reheard must be included in any petition for rehearing or petition for rehearing en banc. See
11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming
compensation for time spent on the appeal no later than 60 days after either issuance of mandate
or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via
the eVoucher system. Please contact the CJA Team at (404) 335-6167 or
cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher
system.

Pursuant to Fed.R.App.P. 39, each party to bear own costs.

Please use the most recent version of the Bill of Costs form available on the court's website at www.ca11.uscourts.gov.

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call Joseph Caruso, GG at (404) 335-6177.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Djuanna H. Clark
Phone #: 404-335-6151

                                          OPIN-1A Issuance of Opinion With Costs